UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KEVIN THURMOND,

Plaintiff,

v.

AVION THOMAS-WALSH, *Medical
Provider*; FREDERICK BERNSTEIN,
*Facility Health Services Director and
Nurse Administrator*,

Defendants.

No. 18-CV-409 (KMK)

OPINION & ORDER

---

Appearances:

Kevin Thurmond
Woodbourne, NY
*Pro Se Plaintiff*

Janice Powers, Esq.
Office of the New York State Attorney General
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

Pro se Plaintiff Kevin Thurmond ("Plaintiff"), currently incarcerated at Woodbourne

Correctional Facility ("Woodbourne"), filed the instant Complaint ("Complaint"), pursuant to 42

U.S.C. § 1983, against Medical Provider Avion Thomas-Walsh ("Thomas-Walsh"), and Facility

Health Services Director and Nurse Administrator Frederick Bernstein, MD, FHAS ("Dr.

Bernstein") (collectively, "Defendants").[1]  (Compl. (Dkt. No. 2).)  Plaintiff alleges that

---

[1] Plaintiff also sometimes refers to Thomas-Walsh as "Nurse Practitioner" or "NP."  *See* Plaintiff's Declaration in Opposition to Defendants' Motion to Dismiss.  (Pl.'s Decl. in Opp'n to Defs.' Mot. To Dismiss ("Pl.'s Opp'n") 13–14 (Dkt. No. 23).)

Defendants violated his rights under the First and Eighth Amendments because they were deliberately indifferent to his need for medication for his skin condition, and retaliated against him for filing grievances. (*Id*.) Before the Court is Defendants' Motion To Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* Not. of Mot. (Dkt. No. 21).) For the following reasons, Defendants' Motion is granted in part and denied in part.

<u>I. Background</u>

<u>A. Factual Background</u>

The following facts are taken from Plaintiff's Complaint, (Compl.), and Plaintiff's Opposition to Defendants' Motion to Dismiss, (Pl.'s Decl. in Opp'n to Defs.' Mot. To Dismiss ("Pl.'s Opp'n") (Dkt. No. 23)), both of which include attached exhibits, and are taken as true for the purpose of resolving the instant Motion.

Plaintiff alleges that on December 24, 2013, he started to experience "attacks," during which his skin would "swell up, turn red and sting and itch uncontrollably." (Compl. 7.)[2] Plaintiff was prescribed Hydroxyzine Pamoate (or "Vistaril"), the generic form of Vistaril, with one refill that same day, on December 24, 2013. (*Id*. at 25.)[3]

---

[2] The Plaintiff's Complaint and Opposition both contain several exhibits and do not have consistent pagination. To avoid confusion, the Court cites to the ECF-generated page numbers at the top right corner of the relevant page.

[3] The prescription label for Hydroxyzine Pamoate is attached to Plaintiff's Complaint as Exhibit B. (Compl. 25.) Hydroxyzine Pamoate is an antihistamine used to treat itching caused by allergies and "may also be used short-term to treat anxiety . . . ." *See* Hydroxyzine Pamoate, WebMd, https://www.webmd.com/drugs/2/drug-7092/hydroxyzine-pamoate-oral/details (last visited Feb. 19, 2019). Hydroxyzine Pamoate is the generic form of Vistaril. *See* Vistaril, RxList, https://www.rxlist.com/vistaril-side-effects-drug-center.htm (last visited Feb. 19, 2019).

On May 21, 2014, Plaintiff was prescribed a new medication, Atarax (or Hydroxyzine Hydrochloride).[4] (Compl. 7, 29.) Plaintiff alleges that Atarax did not work to relieve his symptoms. (*Id*. at 7.) While on Atarax, he continued to have "attacks" and also developed phobias about whether the medical personnel at the facility intended to hurt him. (*Id*.) Plaintiff alleges he took Atarax for three days and continued to have attacks. (Pl.'s Opp'n 4.) Plaintiff alleges it took him eight days to be rescheduled to see Thomas-Walsh to let her know Atarax was not working at all. When he told her that Atarax was not working she allegedly responded, "No! I'm not giving you anything! [G]et out!" (*Id*.)[5]

On May 29, 2014, Plaintiff wrote a letter to Dr. Bernstein, the Facility Health Services Director and Nurse Administrator explaining that Thomas-Walsh had switched him from Vistaril to Atarax, that the latter was not working, that he was still having terribly painful attacks, and that Thomas-Walsh refused to switch him back to Vistaril. (*Id*. at 15–16.) Plaintiff detailed his anguish at length and alleged that he was afraid for his life because he had previously filed a grievance against Thomas-Walsh related to her taking his white blood cell count without his permission, and that he did not believe that his suffering would end while he was under her care.

---

[4] Atarax is an antihistamine used to treat itching caused by allergies, and "may also be used short-term to treat anxiety . . . ." The generic name of Atarax is Hydroxyzine Hcl. *See* Hydroxyzine Hcl, WedMd, https://www.webmd.com/drugs/2/drug-7681/hydroxyzine-hcl-oral/details (last visited Feb. 19, 2019). Atarax can be used for "symptomatic relief of anxiety and tension associated with psychoneurosis." *See* Atarax, RxList, https://www.rxlist.com/atarax-drug.htm#description (last visited Feb. 19, 2019).

[5] Throughout his Opposition, Plaintiff refers to "the defendant" when discussing his primary care provider, specifically the person who wrote the prescriptions at issue in May 2014 and whom he filed grievances against in February 2014. (*See* Pl.'s Opp'n 2–5.). The Court understands this "defendant" to be Thomas-Walsh, who was Plaintiff's Medical Provider and refers to her specifically in describing Plaintiff's allegations.

(*Id.*)[6] Dr. Bernstein responded on June 12, 2014, stating that he had reviewed Plaintiff's medical record and concluded that the "primary care provider prescribed . . . the correct medication." (Compl. 21.) Dr. Bernstein instructed Plaintiff that if the medication he was on was not helpful he should address this concern with his primary care provider, and that he could request an appointment with her during the next block sick call. (*Id.*) Dr. Bernstein also concluded that there was no medical reason to change Plaintiff's primary care provider and denied his request to have his primary care provider changed. (*Id.*)

On June 2, 2014, Plaintiff wrote a letter to Deputy Superintendent O'Neil to the same effect—stating that Thomas-Walsh had switched his medication in retaliation for his filing a grievance against her for taking his white blood cell count, and that he could not go back to sick call because it would require him to see her again. Plaintiff asked for a new medical provider. (Pl.'s Opp'n 14.)

On June 5, 2014, Plaintiff filed a grievance asking to be prescribed medication for itching. (Compl. 29.) The Superintendent denied his request on September 8, 2014, stating,

> The Facility Health Services Director and the grievant's provider previously met with the grievant and explained to him that Vistaril . . . is used for psychological purposes and the Atarax . . . is used for itching. Vistaril is not [to] be used for that purpose long term. The grievant's provider prescribed Vistaril once because the grievant reported it helped relieve his itching at that time. The provider informed the grievant that this relief would be short term. The grievant must use Atarax.

---

[6] Plaintiff filed a grievance on February 24, 2014, alleging that an HIV test was conducted on him without his consent and requesting a change of provider. (Pl.'s Opp'n 12.) Plaintiff also alleged that the IGRC granted his request for a new provider. The Superintendent concluded that the medical record did not indicate Plaintiff was tested for an impaired immune system and that there was no documentation that the IGRC has found in his favor. (*Id.*) Accordingly, Plaintiff's grievance was denied. (*Id.*) Plaintiff appealed that decision on May 7, 2014, stating that Thomas-Walsh had told him to show her his rash and that he responded that he did not have one. She then asked him if it was hard for him to swallow and he responded that it was not. He also told her that there was no reason to test his immune system other than to see if he was HIV positive. (*Id.*)

(*Id.*)

Plaintiff alleges he was not given any other medication until July 8, 2014, at which time he was given Benadryl. (Compl. 7, 23.)[7] Plaintiff was not sent to a dermatologist until August 5, 2014. (*Id*. at 7.) During his August 5, 2014 appointment with the dermatologist, Plaintiff alleges he was diagnosed with a "severe and extremely painful skin disorder called 'Hives.'" (Pl.'s Opp'n 2.)[8] On August 6, 2014, Thomas-Walsh filled out a consultation request for Plaintiff to see the dermatologist again. (*Id*. at 20.)

During Plaintiff's follow-up visit with the dermatologist on September 18, 2014, the dermatologist prescribed Vistaril again and allegedly told Plaintiff that he should take Vistaril for "a year or however long it takes for the Hives attacks to go away completely." (*Id*. at 2.) The dermatologist's September 18, 2014 consultant report confirmed the Hives or "Urticaria" diagnosis. (*Id*. at 20.)

Plaintiff appealed the denial of his grievance to the Central Office Review Committee ("CORC") on September 11, 2014. (Compl. 29.) By opinion dated January 14, 2015, CORC accepted Plaintiff's grievance request in part. (*Id*. at 31.) The opinion states that "although not usually prescribed for long term use, [Plaintiff] is currently prescribed Vistaril (hydroxyzine pamoate), and Benadryl for itch relief." (*Id*.) The opinion further states that "the grievant is not entitled to be seen by the health care provider of his choice" and that "CORC has not been

_____

[7] The prescription label for Diphenhydramine ("similar to Benadryl") is attached to Plaintiff's Complaint as Exhibit A. (Compl. 23.)

[8] Urticaria, or Hives, "is an outbreak of swollen, pale red bumps or plaques []on the skin that appear suddenly—either as a result of the body's reaction to certain allergens, or for unknown reasons . . . . Hives cause itching, but may also burn or sting." *See* Hives, WebMd, https://www.webmd.com/skin-problems-and-treatments/guide/hives-urticaria-angioedema#1 (last visited Feb. 19, 2019). Some patients may have acute or chronic urticaria. *Id*.

presented with sufficient evidence of improper medical care, retaliation or malfeasance by staff." (*Id.*)

On October 30, 2017, Plaintiff underwent a mental health screening during which he reported "increased anxiety over not being able to receive medication," but denied any need for mental health services. (Pl.'s Opp'n 21.) During the screening Plaintiff reported he was taking Vistaril and Zyrtec for allergies and Hives. The nurse told him Vistaril was mental health medication, but Plaintiff "knew that it wasn't, because he had never seen [the] mental health [department]" and he was taking it for his Hives. (*Id.*)

Plaintiff alleges that Defendants allowed him "to go 40[] days without any medication at all, even though they had knowledge that there was other medication to treat [his] attacks." (Compl. 5.) Plaintiff alleges Defendants denied him the medication that did work to stop his attacks, specifically, Vistaril, "in retaliation for [g]rievances filed against them." (*Id.*) Plaintiff claims that his "medication that was intentionally interrupted by [Thomas-Walsh] to cause the plaintiff pain in retaliation for Grievances that were filed on [February 24, 2014] and decided by the Superintendent on [April 7, 2014] prior to the incident, to have [Thomas-Walsh] removed as his medical provider because the defendant was having all kinds of tests taken on the [Pla]intiff without consulting him first." (Pl.'s Opp'n 2.)

Plaintiff alleges Thomas-Walsh "deliberately changed [Plaintiff's] medication from Vistaril to [] Atarax [] because the defendant knew that [Plaintiff's] medical condition was serious and knew that . . . Atarax []would not work," (*id.* at 2), and in order to cause Plaintiff "extreme pain and suffering," (*id.* at 2–3). Plaintiff alleges that Vistaril and Atarax are both "itch medications," that Atarax is the "the weaker medication" "used by children," and that Thomas-

Walsh knew this and intentionally prescribed it to him "knowing it was not strong enough in retaliation." (*Id.* at 5).

Plaintiff alleges that as a result of being denied Vistaril, he "suffered serious harm" including further swelling, redness, stinging, and itchiness of his skin, that advanced to the point of his skin bleeding. (Compl. 5.) These attacks impacted all areas of Plaintiff's body and face. (*Id.*)

Plaintiff alleges that the fact that he was prescribed Vistaril again in September 2014 by the dermatologist, proves that he was not switched off of Vistaril for Defendants' stated reason, specifically that it was a psychological purposes. Plaintiff alleges that this reason offered by Defendants was pretextual, that Vistaril is not just a psychological drug, and that with respect to him it was used to treat Hives. (Pl.'s Opp'n 6–7.) Plaintiff alleges in the alternative that inasmuch as Vistaril is a psychological drug, then so is Atarax because they both "contain[] the ingredient Hydroxyzine." (*Id.* at 7.)

B.  Procedural Background

Plaintiff filed his Complaint on January 12, 2018. (Compl.) He was granted in forma pauperis status on January 18, 2018. (Dkt. No. 4.) On January 23, 2018, the Court issued an Order directing service on Defendants. (Order of Service (Dkt. No. 6).) Defendants were properly served. (Dkt. (entries for Jan. 23, 2018); Dkt. No. 7; Letter from Janice L. Powers, Esq., to Court (Apr. 11, 2018) (Dkt. No. 11); Dkt. Nos. 15–16.)

On May 7, 2018, counsel for Defendants submitted a pre-motion letter to the Court requesting permission to file a Motion To Dismiss. (*See* Letter from Janice L. Powers, Esq., to Court (Dkt. No. 17).) On May 15, 2018, the Court granted Defendants leave to file a Motion To Dismiss and set a motion briefing schedule. (Dkt. No. 18.)

On June 14, 2018, Defendants filed the instant Motion To Dismiss and accompanying papers. (*See* Not. of Mot.; Defs.' Mem. of Law in Supp. of Mot. To Dismiss ("Defs.' Mem.") (Dkt. No. 22).) On July 17, 2018, Plaintiff filed his Opposition to Defendants' Motion to Dismiss. (Pl.'s Opp'n.) Defendants filed their Reply in Further Support of their Motion To Dismiss on July 30, 2018. (*See* Defs.' Mem. of Law in Further Supp. of Mot. To Dismiss ("Defs.' Reply") (Dkt. No. 24).)

## II. Discussion

### A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will

. . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering Defendants' Motion To Dismiss, the Court is required to "accept as true all of the factual allegations contained in the [C]omplaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same).  And, the Court must "draw[] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Where, as here, a plaintiff proceeds pro se, the Court must "construe[] [his complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted).  However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedure and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted);

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted).  However, when the Plaintiff is pro se, the Court may consider "materials

outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including, "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a] defendant's request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013), and "documents that the plaintiff[] either possessed or knew about and upon which [he or she] relied in bringing the suit," *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).

## B. Eighth Amendment Deliberate Indifference Claim

Defendants argue that Plaintiff fails to state an Eighth Amendment claim because his skin condition was not sufficiently serious and the delay in providing him medication was not so unreasonable as to satisfy the objective standard of deliberative indifference. (Defs.' Mem. 1, 4–5; Defs.' Reply 2–7.) Defendants also argue that disagreements about medication choice and dosage, and post hoc proven ineffectiveness of medication, do not satisfy the subjective standard of deliberate indifference. (Defs.' Mem.1, 5–10; Defs.' Reply 8–10.)

### 1. Applicable Law

"The Eighth Amendment forbids 'deliberate indifference to serious medical needs of prisoners.'" *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A convicted prisoner's claim of deliberate indifference to his medical needs by those overseeing his care is analyzed under the Eighth Amendment because it is an allegation that his "conditions of confinement [are] a form of punishment" and thus are a "violation of [the] Eighth Amendment right to be free from cruel and

unusual punishments." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017). To state a deliberate indifference claim, Plaintiff must plausibly allege (1) "that he suffered a sufficiently serious constitutional deprivation," and (2) that Defendants "acted with deliberate indifference." *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at *8 (S.D.N.Y. Mar. 30, 2017).

"The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Spavone*, 719 F.3d at 138 (citation and quotation marks omitted). In other words, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Analyzing this objective requirement involves two inquiries: "whether the prisoner was actually deprived of adequate medical care," *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006), and "whether the inadequacy in medical care is sufficiently serious," which in turn "requires the [C]ourt to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner," *id.* at 280 (citing *Helling v. McKinney*, 509 U.S. 25, 32–33 (1993)). "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Nevertheless, the Second Circuit has suggested the following non-exhaustive list of factors to consider when evaluating an inmate's medical condition: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

"The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care." *Spavone*, 719 F.3d at 138 (citation omitted).  This means that the defendant must "appreciate the risk to which a prisoner was subjected," and have a "subjective awareness of the harmfulness associated with those conditions."  *Darnell*, 849 F.3d at 35; *see also Nielsen v. Rabin,* 746 F.3d 58, 63 (2d Cir. 2014) ("Deliberate indifference is a mental state equivalent to subjective recklessness," and it "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." (citation and quotation marks omitted)).  In other words, "[i]n medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health."  *Id.* (citation and quotation marks omitted).  A defendant's awareness of the risk of serious harm can be established through "inference from circumstantial evidence," including "from the very fact that the risk was obvious."  *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).  However, "mere negligence" is insufficient to state a claim for deliberate indifference.  *Walker*, 717 F.3d at 125 (quoting *Farmer*, 511 U.S. at 835).  Neither does "mere disagreement over the proper treatment . . . create a constitutional claim," and accordingly, "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."  *Chance*, 143 F.3d at 703.

### 2.  Application

#### a.  Objective Prong

"A skin rash is generally insufficient to meet the objective requirement of a sufficiently grave and serious condition giving rise to a deliberate indifference claim."  *Purdie v. City of New*

*York*, No. 10-CV-5802, 2011 WL 1044133, at *3–4 (S.D.N.Y. Mar. 15, 2011) (dismissing

deliberate indifference claim where plaintiff alleged "only a 'bad itch' on his penis and arms"

(citing inter alia *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (per curiam))); *see also*

*Cooper v. Orange County*, No. 15-CV-10075, 2017 WL 3309754, at *5 (S.D.N.Y. Aug. 2, 2017)

(holding that the plaintiff failed to allege his skin rash was sufficiently serious where "the only

stated symptoms of which were an undescribed level and duration of pain, and eventually

scarring," and where the plaintiff did "not allege that the rash caused him to suffer chronic and

substantial pain or that it significantly affected his daily activities"), *appeal dismissed*, No. 17-

2815, 2018 WL 1276746 (2d Cir. Jan. 24, 2018); *Ahlers v. Kaskiw*, No. 12-CV-501, 2014 WL

4184752, at *10 (N.D.N.Y. Aug. 21, 2014) (holding that the plaintiff's skin rash and eczema

were not sufficiently serious medical conditions to meet the objective element of the deliberate

indifference standard); *Melendez v. Costello*, No. 12-CV-6226, 2013 WL 5937052, at *7

(W.D.N.Y. Nov. 1, 2013) (holding that the "[p]laintiff cannot establish the 'serious medical

need' component of a deliberate indifference claim based on his eczema" (citing *Sledge*, 564

F.3d at 107)); *Green v. Cent. Office Review Comm.*, No. 06-CV-6312, 2012 WL 1191596, at *13

& n.5 (W.D.N.Y. Apr. 9, 2012) (holding that the plaintiff failed to demonstrate that his skin

condition, Pseudofolliculitis Barbae, "a facial skin condition that occurs when hair follicles curve

back into the skin [and] become inflamed," was sufficiently serious); *Swindell v. Supple*, No. 02-

CV-3182, 2005 WL 267725, at *7 (S.D.N.Y. Feb. 3, 2005) (holding that a "skin condition . . .

producing excessive itching, scratching, soreness from scratching, and cracked skin" on the

plaintiff's arms, legs, and torso, and bleeding on the legs, was not a condition of "an urgent and

substantially painful nature as would satisfy the" seriousness of deprivation requirement (citation

omitted)); *Samuels v. Jackson*, No. 97-CV-2420, 1999 WL 92617, at *1–3 (S.D.N.Y. Feb. 22,

1999) (holding that inmate's various skin conditions of "papules, vesicles, pustules, burrows, and intense itching" causing "constant scratching of the affected areas, causing open sores, and abrasions" and "permanent scars" did not constitute a sufficiently serious medical condition (alteration omitted)).

However, "if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Salahuddin*, 467 F.3d at 280 (citation and quotation marks omitted); *see also Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (noting that the "seriousness of a delay in medical treatment may be decided by reference to the effect of delay in treatment . . . [c]onsequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay" (citation and quotation marks omitted)).  "Where temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in [the Second] Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." *Ferguson v. Cai*, No. 11-CV-6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012). For example, in *Smith*, an HIV positive inmate alleged that prison defendants deprived him of HIV medication on two occasions, first for seven days then for five days, despite his repeated requests for medication.  *See* 316 F.3d at 181.  The Second Circuit concluded that in assessing the seriousness of the plaintiff's medical condition, it was appropriate to consider that the plaintiff failed to present any evidence "that the two alleged episodes of missed medication resulted in permanent or on-going harm to his health" and whether the plaintiff had been

"exposed to an unreasonable risk of future harm due to the periods of missed HIV medication."

*Id*. at 188–89. With respect to delays in providing treatment for serious skin conditions, courts in the Second Circuit have rarely held that a "[p]laintiff's discomfort during [a] period of misdiagnosis and his resulting scars" satisfy the objective requirement of a deliberate indifference claim. *Samuels*, 1999 WL 92617, at *2 (dismissing the inmate's deliberate indifference claim related to his delay in effective treatment for scabies because, even though the "plaintiff's condition was initially misdiagnosed and the two medications initially prescribed appear not to have worked," such allegations "establish nothing more than ordinary negligence"); *see also Cooper*, 2017 WL 3309754 at *5 (dismissing inmate the plaintiff's deliberate indifference claim related to his delay in receiving treatment for his skin rash because during the alleged delay the defendant had "repeatedly treated [the] plaintiff for his complained-of condition").[9]

---

[9] The Court is aware of only one case in the Second Circuit in which a plaintiff successfully stated an Eighth Amendment medical deliberate indifference claim based on a skin condition. In *Gonzalez v. Correctional Management Health Care*, 17-CV-1402, 2018 WL 5817004 (D. Conn. Nov. 6, 2018), the plaintiff was treated by a prison doctor for "painful tingling, itching, and burning skin with various creams/ointments and oral medications" from 2012 to June 2016. *Id*. at *7. In early 2014, after taking an oral medication for nine months, the plaintiff reported to his doctor that the medication was not alleviating his symptoms. At that time, the doctor did not prescribe new treatment for the skin condition but instead ordered other testing related to the plaintiff's liver. *Id*. In February 2015, the doctor finally prescribed a new drug that alleviated the plaintiff's skin symptoms. Subsequently, the doctor repeatedly adjusted the dosages of the new drug to try and optimize its effectiveness. The court concluded that the plaintiff alleged a plausible claim that the doctor was deliberately indifferent to his "painful and itchy skin condition" with respect to the period from early 2014 to February 2015, during which the plaintiff had no effective medication, but not with respect to the periods before and after because during those periods the doctor prescribed various ointments and oral medications to try and alleviate the plaintiff's symptoms. *Id*. at *8. The *Gonzalez* court, however, did not consider the threshold question of whether a skin rash is a serious medical condition, or whether the delay or interruption in treatment was serious enough to satisfy the objective requirement of a deliberate indifference claim, nor the line of cases addressing skin conditions in the medical deliberate indifference context to which this Court cites above. In any event, the year-long delay in providing treatment to the plaintiff in *Gonzalez*, is readily distinguishable from the seven-

Here, Plaintiff alleges an interruption of treatment.  From December 24, 2013, to May 21, 2014, Plaintiff took Vistaril, which effectively treated his "attacks."  (Compl. 7, 25.)  Then, starting on May 21, 2014, Thomas-Walsh prescribed him Atarax, which did not relieve his symptoms, so that Plaintiff continued to experience his painful symptoms.  (Compl. 7, 29.)  Plaintiff took Atarax for three days but continued to have attacks, and reported this to Thomas-Walsh eight days later at a follow-up appointment.  She allegedly responded, "No! I'm not giving you anything! [G]et out!"  (Pl.'s Opp'n 4.)  Plaintiff was not given any other medication until July 8, 2014, at which time he was given Benadryl.  (Compl. 7, 23.)  During Plaintiff's follow-up visit with the dermatologist on September 18, 2014, the dermatologist prescribed Vistaril again.  (Pl.'s Opp'n 2.)

The Court is sympathetic to Plaintiff's contentions that he was in serious pain.  However, a skin rash or condition, even one that involves bleeding and scarring, is not a medical condition that gives rise to an Eighth Amendment deliberate indifference claim, even where there are delays in treatment.  *See Ahlers*, 2014 WL 4184752, at *10 (holding that the plaintiff's skin rash and eczema were not sufficiently serious medical conditions to meet the objective element of the deliberate indifference standard); *Swindell*, 2005 WL 267725 at *7 (holding that a "skin condition . . . producing excessive itching, scratching, soreness from scratching, and cracked skin" on the plaintiff's arms, legs, and torso, and bleeding on the legs, was not a condition of "an urgent and substantially painful nature as would satisfy the" seriousness of deprivation requirement); *Samuels*, 1999 WL 92617, at *1–3 (holding that an inmate's various skin conditions of "papules, vesicles, pustules, burrows, and intense itching" causing "constant

---

week interruption in treatment in the present case during which Plaintiff allegedly had no medication.

scratching of the affected areas, causing open sores, and abrasions" and "permanent scars" did not constitute a sufficiently serious medical condition).  Plaintiff has not alleged that his condition has impacted his daily activities and he has not alleged any facts that establish that his condition was any worse than the similar types of skin conditions that courts in the Second Circuit have repeatedly found are not serious medical conditions.  As to the delay in treatment here—specifically the period from May 21, 2014 to July 8, 2014, during which Plaintiff had no medication before he was prescribed Benadryl—Plaintiff has not alleged that his condition worsened during this period, or that he will suffer any long-term consequences because of the delay in treatment.  (Compl. 7, 23.)  Plaintiff was again prescribed Vistaril by September 18, 2014—within three months of his initial complaint.  (Pl.'s Opp'n 2.)  And during the three-month period, Plaintiff was seen by Thomas-Walsh and the dermatologist on a number of occasions.  (Compl. 7, 23, 25, 27; Pl.'s Opp'n 2, 4–5, 20.)  *Cf. Balkum v. Unger*, No. 06-CV-6578, 2009 WL 290439, at *5 (W.D.N.Y. Feb. 5, 2009) (granting summary judgment in favor of defendants where the "record indicate[d] that [one of the defendants] was attentive to [the] [p]laintiff's medical needs, as shown by the fact that [the defendant] provided pain medication and diagnostic testing . . . .").  The Court therefore concludes that Plaintiff has failed to state an objectively serious medical condition.

### b.  Subjective Prong

Plaintiff also has insufficiently pleaded the subjective element required to state a claim under the Eighth Amendment.  Deliberate indifference "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Nielson*, 746 F.3d at 63 (citation omitted); *see also Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (stating that "a prison official does not act in a deliberately indifferent manner unless

that official 'knows of and disregards an excessive risk to inmate health or safety'" (quoting *Farmer*, 37 F.3d at 837)).

Here, Plaintiff alleges that on May 21, 2014, Thomas-Walsh intentionally interrupted his use of Vistaril to hurt him and that she did this knowing that Atarax was not strong enough to alleviate his severe symptoms. (Compl. 7, 25; Pl.'s Opp'n 2, 4–5, 12.) Plaintiff alleges he told Thomas-Walsh in late May 2014 that the new medication was not working, and that she told him she was not giving him any other medication. (Pl.'s Opp'n 4.) Plaintiff's submissions make clear, however, that his doctors placed him on various medications during the relevant time period and seemingly disagreed as to which medication was appropriate. On July 8, 2014, Plaintiff was prescribed Benadryl. (Compl. 7, 23.) On September 18, 2014, Plaintiff was placed back on Vistaril by the dermatologist. (Pl.'s Opp'n 2.) On January 14, 2015, CORC noted with approval that Plaintiff was prescribed Vistaril and Benadryl for itch relief—implying that this was an appropriate combination. (Compl. 31.) Dr. Bernstein, on the other hand, had concluded in his June 12, 2014 response to Plaintiff's complaint that Thomas-Walsh correctly prescribed Atarax. (*Id*. at 21.) The Superintendent also concluded on September 8, 2014, that Atarax was an appropriate drug for Plaintiff to take. (*Id*. at 29.)

"[C]ourts have repeatedly declined to find that a medical provider was deliberately indifferent to an inmate's medical needs" when a plaintiff challenges "the type and quantity of pain medication." *Williams v. Williams*, No. 13-CV-3154, 2015 WL 568842, at *5 (S.D.N.Y. Feb. 11, 2015) (citation omitted); *see also Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir. 2011) (holding that an inmate failed to state a claim for deliberate indifference where he alleged that stronger pain medication was necessary to treat his medical condition); *Veloz v. New York*, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004) ("Differences in opinion by a doctor and a prisoner over

the appropriate medication to be prescribed is a disagreement over a treatment plan and does not implicate the Eighth Amendment." (citations omitted)), *aff'd*, 178 F. App'x 39 (2d Cir. 2006). Here, there was disagreement among Plaintiff's doctors as to what the correct medication for Plaintiff was. That Atarax turned out to be ineffective and that Vistaril was ultimately prescribed to Plaintiff for long-term use does not give rise to an Eighth Amendment violation. *See Harris v. Westchester Cty. Med. Ctr.*, No. 08-CV-1128, 2011 WL 2637429, at \*3 (S.D.N.Y. July 6, 2011) ("As for misdiagnosis, without more, allegations of negligent treatment and misdiagnosis do not state a cause of action under the Eighth Amendment." (citation, alteration and internal quotation marks omitted)); *Ravenell v. Van der Steeg*, No. 05-CV-4042, 2007 WL 765716, at \*6 (S.D.N.Y. Mar. 14, 2007) ("While a plaintiff may be able to state an Eighth Amendment claim where a doctor acts without medical justification, no claim is stated when a doctor disagrees with the professional judgment of another doctor." (citation and quotation marks omitted)).

Plaintiff's conclusory allegation that Thomas-Walsh intended to hurt him by prescribing what Plaintiff describes as a "weaker medication," (Pl.'s Opp'n 5), does not amount to her having disregarded an "excessive risk to [Plaintiff's] health or safety," *Hathaway*, 37 F.3d at 66; *see also Evans v. Albany Cty. Corr. Facility*, No. 05-CV-1400, 2009 WL 1401645, at \*9 (N.D.N.Y. May 14, 2009) (noting that "a showing of deliberate indifference requires more than just vague and conclusory allegations" (citation and quotation marks omitted)). Plaintiff does not allege what "excessive risk" to his health and safety Thomas-Walsh and Dr. Bernstein were aware of and disregarded. Instead, Plaintiff alleges that Thomas-Walsh and Dr. Bernstein were aware that he had an allegedly severe skin condition and that there was back-and-forth about what itch medication to prescribe him. After all, Plaintiff does not allege that Thomas-Walsh denied him medicine of any kind. Plaintiff's conclusory allegations thus do not plausibly allege

that Thomas-Walsh and Dr. Bernstein were deliberately indifferent to his medical condition. Plaintiff's Complaint in fact recounts the numerous medical appointments Plaintiff had with Thomas-Walsh and the dermatologist related to his skin condition during the period in question, and the treatment he received during those appointments. (Compl. 7, 23, 25, 29; Pl.'s Opp'n 2, 20.) Thomas-Walsh prescribed Plaintiff Vistaril in December 2013, (*id*. at 7, 25), Atarax in May 2014, (*id*. at 7, 29), Benadryl in July 2014, (Compl. 23), and referred him to the dermatologist in August 2014, (Pl.'s Opp'n 20). The dermatologist ultimately placed him back on Vistaril in September 2014. (*Id*. at 2.) Simply put, Plaintiff's medical needs were not ignored. Therefore, Plaintiff's Eighth Amendment claim is dismissed as to Thomas-Walsh and Dr. Bernstein.

### C. First Amendment Retaliation Claim

Construing the Complaint liberally, as this Court must, Plaintiff states a claim for retaliation. Plaintiff alleges that Defendants denied him Vistaril, the medication that was effective in treating his Hives, "in retaliation for [g]rievances filed against them," (Compl. 5), and claims that Thomas-Walsh intentionally prescribed Atarax "knowing it was not strong enough" to treat his Hives in retaliation for his filing grievances against her in February 2014. (Pl.'s Opp'n 5). Defendants argue that "[t]here is no retaliation where the inmate is able to file grievances and lawsuits" and that any "alleged adverse action [Defendants took] did not have an actual deterrent effect on [Plaintiff's] exercise of his First Amendment rights," because Plaintiff was able to file grievances and this lawsuit after the allegedly retaliatory conduct. (Defs.' Reply 10.)

#### 1. Applicable Law

"Prisoners have a constitutional right to petition the government, and it is a violation of § 1983 for prison officials to retaliate against prisoners for the exercise of that right." *Bartley v.*

*Collins*, No. 95-CV-10161, 2006 WL 1289256, at *4 (S.D.N.Y. May 10, 2006) (citing *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002)).  To state a First Amendment retaliation claim, Plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that . . . [D]efendant took adverse action against . . . [P]laintiff, and (3) that there was a causal connection between the protected conduct and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (citation, alteration, and quotation marks omitted); *see also Washington v. Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at *9 (S.D.N.Y. Mar. 30, 2015) (same). "[B]ecause virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act," the Second Circuit has instructed district courts to "approach prisoner retaliation claims with skepticism and particular care." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (citation and quotation marks omitted); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." (citation and quotation marks omitted)).

### 2.  Application to Thomas-Walsh

#### a.  Protected Speech

"It is well-established that inmates' filing of grievances is a constitutionally protected exercise of their right under the First Amendment to petition the government for the redress of grievances." *Mateo v. Bristow*, No. 12-CV-5052, 2013 WL 3863865, at *4 (S.D.N.Y. July 16, 2013) (citations omitted); *see also Dolan*, 794 F.3d at 294 ("It is well established that retaliation against a prisoner for pursuing a grievance violates the right to petition [the] government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable

under § 1983." (citation and quotation marks omitted)); *Houston v. Zen Zen*, 388 F. Supp. 2d 172, 174 (W.D.N.Y. 2005) ("The filing of lawsuits or prison grievances is a constitutionally protected activity." (citing *Graham*, 89 F.3d at 80)); *Baskerville v. Blot*, 224 F. Supp. 2d 723, 731 (S.D.N.Y. 2002) (noting that a "prisoner's filing of a grievance" and "the filing of a lawsuit" are "constitutionally protected activit[ies]" (citations omitted)). Here, Plaintiff filed a grievance on February 24, 2014 alleging that Thomas-Walsh conducted an HIV test on him without his consent and requesting a change of provider. (Pl.'s Opp'n 12.) When his grievance was denied, Plaintiff appealed that decision on May 7, 2014. (*Id.*) Plaintiff alleges that Thomas-Walsh intentionally interrupted his use of Vistaril, which alleviated his symptoms, "to cause [him] pain in retaliation for [g]rievances that were filed on [February 24, 2014]." (*Id.* at 2.) Plaintiff thus engaged in protected activity.

### b. Adverse Action

An adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citation omitted). In determining whether a prison official's conduct constitutes adverse action, "the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens." *Id.* (citation, quotation marks, and alterations omitted). "[T]he test, however, is not whether [the] plaintiff . . . himself was chilled (if that were the standard, no plaintiff likely would prevail, for the very commencement of a lawsuit could be used by [the] defendants to argue that the plaintiff was not chilled)." *Id.* at 353–54 (citation omitted).

"[I]t is plausible that a denial of medical evaluation, treatment, and adequate pain medication would suffice to deter a similarly situated individual of ordinary firmness from filing a constitutionally protected grievance against a prison doctor." *Burton v. Lynch*, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) (citation omitted); *see also Arriaga v. Gage*, No. 16-CV-1628, 2018 WL 1750320, at *10 (S.D.N.Y. April 6, 2018) (holding that the plaintiff's numerous allegations that prison doctor interfered with his medical passes, outright denied his requests for treatment recommended by another doctor, and denied him any treatment while forcing him to wait at sick call once a week for two months, were sufficient to state an adverse action); *Davis*, 320 F.3d at 353 (reversing dismissal of a retaliation claim because denial of medically prescribed high fiber diet and delay in scheduling medical appointment could constitute an adverse action).

Defendants cite *Gill v. Pidlypchak*, 389 F.3d 379 (2d Cir. 2004), to argue that there was no retaliation here because Plaintiff was able to file further grievances and this lawsuit after the allegedly retaliatory conduct occurred. Defendants represent *Gill* as a case in which the First Amendment retaliation claim was ultimately unsuccessful because the plaintiff was not himself deterred from filing further grievances. (Defs.' Reply 10.) This, is a curious position because in *Gill*, the Second Circuit actually vacated the district court's dismissal of Plaintiff's First Amendment retaliation claim. *Gill*, 389 F.3d at 384. The Court explained that although "subjective chilling is a general requirement, where a plaintiff alleges that the protected conduct at issue is the prior filing of a *grievance* or *lawsuit* against the defendant, it would be unfair in the extreme to rule that plaintiff's bringing of the subsequent claim in itself defeated his claim of retaliation." *Id.* at 383. Thus, it is not dispositive that Plaintiff here was able to file further grievances even after the alleged adverse action of switching his medication was taken.

Contrary to Defendants' argument, in evaluating Plaintiff's retaliation claim, the Court asks whether the denial of medication that allegedly occurred would "deter a similarly situated individual of ordinary firmness from filing a constitutionally protected grievance against a prison doctor." *Burton*, 664 F. Supp. 2d at 367. Plaintiff alleges that from May 21, 2014, when Thomas-Walsh prescribed him Atarax, until he was given Benadryl on July 8, 2014, (Compl. 7, 23), for seven weeks, he was without *any medication* at all. Ultimately, Plaintiff was without Vistaril between May 21 and September 18, 2014. (Pl.'s Opp'n 2.) During this time, Plaintiff alleges he was in excruciating pain. According to Plaintiff, his medication was withheld and delayed in retaliation for filing a grievance against Thomas-Walsh. (*Id.* at 2, 12.) The Court concludes that withholding effective medication for seven weeks in retaliation for filing a grievance constitutes an adverse action under the circumstances Plaintiff alleges. *See Olutosin v. Lee*, No. 14-CV-685, 2016 WL 2899275, *10 n.5 (S.D.N.Y. May 16, 2016) (denying motion to dismiss First Amendment retaliation claim where one of the alleged adverse actions was delay in providing inmate care for his injured eye after a fight and stating "general allegations of denial of medical care are sufficient to allege an adverse action"); *Walker v. Schriro*, No. 11-CV-9299, 2013 WL 1234930, at *9 (S.D.N.Y. Mar. 26, 2013) (stating that "[d]enial of medical care that could address 'extreme pain' surely qualifies as an [adverse] action") (quoting *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002))); *Williams v. Fisher*, No. 02-CV-4558, 2003 WL 22170610, at *10–11 (S.D.N.Y. Sept. 18, 2003) ("Allegations that [a prison doctor] revoked Plaintiff's necessary medical rehabilitative treatment because he filed a grievance are sufficient to satisfy the second element of a retaliation claim [for the purposes of a motion to dismiss.]").

Cases in which courts in the Second Circuit have found the denial of medical treatment to not amount to an adverse action have involved de minimis injuries or denials of medication—for example, one missed dose of medication, or minor delays in receipt of medication. *See, e.g., Bumpus v. Canfield*, 495 F. Supp. 2d 316, 326–27 (W.D.N.Y. 2007) (holding that ordering allegedly retaliatory urine test was not an adverse action where plaintiff failed to allege that test was not administered for legitimate purpose and because urine tests are a fact of prison life and taking one test would not chill a prisoner of ordinary firmness); *Davidson v. Bartholome*, 460 F. Supp. 2d 436, 447 (S.D.N.Y. 2006) (holding that nurse's refusal to administer prisoner a single dose of an over-the-counter pain reliever was de minimis, where prisoner had received his medication a few hours earlier and received more medication a few hours after nurse allegedly refused to treat him). An alleged seven-week delay in receiving any effective medication, during which an inmate is allegedly in severe pain and bleeding, is not de minimis and indeed amounts to an adverse action.

### c. Causal Connection

The third prong requires a "causal connection" between the protected conduct and the adverse action. *Garcia v. Watts*, No. 08-CV-7778, 2009 WL 2777085, at *11 (S.D.N.Y. Sept. 1, 2009); *see also Dawes,* 239 F.3d at 492 (holding that in order to satisfy the causation requirement, allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action" (citation, alteration, and quotation marks omitted)). A plaintiff must allege facts suggesting that the protected conduct was a "'substantial or motivating factor' in the prison officials' decision to take action against [him]." *Smith v. Christopher*, No. 06-CV-1196, 2008 WL 4283519, at *10 (N.D.N.Y. Sept. 18, 2008) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). "The element of intent [in a First

Amendment retaliation claim] requires an assessment of what evidence, if any, demonstrates that Defendants' conduct "was motivated by or substantially caused by [Plaintiff's] exercise of free speech." *Van Dunk v. Brower*, No. 11-CV-4564, 2013 WL 5970172, at *8 (S.D.N.Y. Nov. 7, 2013) (ultimately quoting *Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994)); *Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals*, 812 F. Supp. 2d 357, 371 (S.D.N.Y. 2011) (same); *see also Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017) (reinstating retaliation claim in part because there was evidence of "retaliatory animus" where plaintiff alleged that officers confronted him directly about his practice of filing grievances before they issued the allegedly false misbehavior report against him); *Fann v. Graham*, No. 15-CV-1339, 2018 WL 1399331, at *9 (N.D.N.Y. Jan. 11, 2018) (denying summary judgment motion where there was evidence the correction officer made comments to plaintiff that could be interpreted as threatening before issuing him an allegedly false misbehavior report), *adopted by* 2018 WL 1399340 (N.D.N.Y Mar. 19, 2018).

Circumstantial facts indicating a retaliatory motive include "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation." *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 872–73 (2d Cir. 1995)). There is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," *Gorman–Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001), so courts determine "the permissible inferences that can be drawn from temporal proximity in the context of particular cases," *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009).

Here, Plaintiff filed a grievance against Thomas-Walsh on February 24, 2014 and appealed the denial of that grievance on May 7, 2014. (Pl.'s Opp'n 12.) On May 21, 2014, he was switched off of the medication that he alleges had effectively treated his "attacks" since December 24, 2013. (Compl. 7, 25.) This three-month gap between the protected speech and the alleged adverse action alone plausibly established an inference of causal connection. *See Espinal*, 558 F.3d at 129 (finding that a six-month gap between the protected conduct and adverse action were sufficient to support an inference of causal connection). Additionally, by opinion dated January 14, 2015, CORC accepted Plaintiff's grievance request in part, noting with approval that "although not usually prescribed for long term use, [Plaintiff] is currently prescribed Vistaril (hydroxyzine pamoate), and Benadryl for itch relief." (Compl. 31.) Thus, Plaintiff's allegation that he needed Vistaril was arguably "vindicated at a hearing on the matter." *Burton*, 664 F. Supp. 2d at 368 (quotation marks omitted). Plaintiff does not allege an outright statement by Thomas-Walsh that she switched his medication in retaliation for his filing of a grievance, but he does allege that he told her the new medication was not working for him at all and she responded, "No! I'm not giving you anything! [G]et out!" (Pl.'s Opp'n 4.) And perhaps most importantly, Plaintiff alleges that Thomas-Walsh intentionally interrupted his medication to hurt him, knowing Atarax was not strong enough to alleviate his severe symptoms, because he filed a grievance against her related to the HIV testing and asked for a new medical provider. (*Id.* at 2, 5.) Taken together, Plaintiff's allegations about the timing of the change in prescription, CORC's ultimate finding, and Thomas-Walsh's words and conduct, plausibly allege a causal connection between the February 24, 2014 grievance and the denial of medication to Plaintiff for seven weeks. *See Arriaga*, 2018 WL 1750320, at *10 (holding that plaintiff showed a causal connection where he alleged that within a week of filing a grievance against the

prison doctor, that same doctor issued him a limited medical pass for only a cane, excluding other prescribed aids recommended by another doctor, where that prison doctor had previously just signed plaintiff's pass without alteration); *Burton*, 664 F. Supp. 2d at 367–68 (concluding inmate stated a prima facie case of retaliation under the First Amendment where inmate alleged prison doctor retaliated against him for filing a grievance by denying him medical evaluation, treatment, and adequate pain medication, where all levels of the inmate grievance process determined that doctor had prescribed prisoner a medication to which he was allergic, and where doctor failed to detect a condition which was later determined to require surgery on prisoner's elbow).  Plaintiff therefore plausibly alleges a First Amendment retaliation claim against Thomas-Walsh and Defendants' Motion To Dismiss with respect to this claim against Thomas-Walsh is denied.[10]

---

[10] The Court is aware that some courts in the Second Circuit have concluded that there can be no retaliation where there is no deliberate indifference.  *See, e.g.*, *Cole v. Levitt*, No. 07-CV-767, 2009 WL 4571828, at *10 (W.D.N.Y. Dec. 4, 2009) (stating that no medical retaliation occurred where there was no evidence of medical deliberate indifference); *Tatta v. Wright*, 616 F. Supp. 2d 308, 320 (N.D.N.Y. 2007) (dismissing plaintiff's claim that he was denied adequate medical care in retaliation for filing grievances where plaintiff failed to establish the denial of adequate medical care).  However, these courts did not expressly consider that the standards for what amounts to an instance of deliberate indifference under the Eighth Amendment and what constitutes an adverse action under the First Amendment are different.  This Court is persuaded by the reasoning in *Olutosin*, 2016 WL 2899275, where the court considered the separate Eighth and First Amendment standards, and concluded that, "[t]hough the Court previously concluded that [p]laintiff failed to state a claim for deliberate indifference . . . general allegations of denial of medical care are sufficient to allege an adverse action."  *Id.* at *10 n.5.  Thus, although the Court here concludes that Plaintiff has failed to allege an Eighth Amendment deliberate indifference claim, it nonetheless concludes that Plaintiff has alleged an adverse action in the withholding of medical treatment as part of a First Amendment retaliation claim.

### 3.  Dr. Bernstein

#### a.  Supervisory Liability

A supervisory official cannot be held liable in a § 1983 action based on respondeat superior.  *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003); *see also Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution.").  "'Absent some personal involvement by [the supervisory official] in the allegedly unlawful conduct of his subordinates,' he cannot be liable under [§] 1983." *Hernandez*, 341 F.3d  at 144–45 (quoting *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987)). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis*, No. 11-CV-1317, 2012 WL 651919, at *6 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)); *see also Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (noting that a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections . . .  in a § 1983 claim" (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985))). Therefore, "a plaintiff must . . . allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).  Moreover, "'direct participation' as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report

or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon*, 58 F.3d at 873 (citation omitted).

Some courts have questioned the continuing applicability of these factors based upon the heightened pleading requirements set forth in *Iqbal*. *See, e.g.*, *Bellamy v. Mount Vernon Hosp.*, No. 07-CV-1801, 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) (holding that "[o]nly the first and third part of the Colon categories pass *Iqbal's* muster"), *aff'd*, 387 F. App'x 55 (2d Cir. 2010). However, the Second Circuit has not yet ruled on the issue. *See Carpenter v. Apple*, No. 15-CV-1269, 2017 WL 3887908, at *9 (N.D.N.Y. Sept. 5, 2017) (citing *Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014) ("We have not yet determined the contours of the supervisory liability test . . . after [Iqbal] [.]") (collecting cases)). Notwithstanding the Second Circuit's silence, the majority of courts considering the issue have determined that "even after the U.S. Supreme Court's decision in *Iqbal*, these 'categories supporting personal liability of supervisors still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated.'" *Hernandez v. Goord*, No. 01-CV-9585, 2013 WL 2355448, at *7 (S.D.N.Y. May 29, 2013) (citations and quotation marks omitted); *see also Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*); *Manning v. Griffin*, No. 15-CV-3, 2016 WL 1274588, at *12 (S.D.N.Y. Mar. 31, 2016) (holding that the Colon factors "remain relevant" only

to the extent that the type of conduct sufficient for supervisory liability under Colon "could serve as conduct that supports a theory of direct liability" (citation omitted)); *Plunkett v. City of New York*, No. 10-CV-6778, 2011 WL 4000985, at *9 (S.D.N.Y. Sept. 2, 2011) ("*Colon* remains the standard for establishing personal involvement by supervisory officials under 42 U.S.C. § 1983.").

Here, the underlying First Amendment retaliation violation requires a showing that the protected conduct was a "'substantial or motivating factor' in the prison officials' conduct," *Smith*, 2008 WL 4283519, at *10, or that the conduct "was motivated by or substantially caused by [Plaintiff's] exercise of free speech," *Tomlins*, 812 F. Supp. 2d at 371.

### b. Application

Dr. Bernstein was the Facility Health Services Director and Nurse Administrator. (Compl. 5.)[11] Plaintiff's sole allegation with respect to Dr. Bernstein is that Plaintiff wrote him a letter on May 29, 2014 explaining in great detail that Thomas-Walsh had switched him from Vistaril to Atarax, that the latter was not working, that he was still having terribly painful attacks, that Thomas-Walsh refused to switch him back to Vistaril, and that Plaintiff was afraid for his life because he believed Thomas-Walsh was retaliating against him because of a grievance he filed against her. (Pl.'s Opp'n 15–16.) Plaintiff attached a copy of this letter to his Opposition. (*Id.*) Dr. Bernstein responded on June 12, 2014, stating that he had reviewed Plaintiff's medical record and concluded that Thomas-Walsh prescribed the correct medication and instructed Plaintiff to further consult with Thomas-Walsh if the medication continued to not be effective.

---

[11] Plaintiff does not expressly allege that Dr. Bernstein was Thomas-Walsh's supervisor, but reading Plaintiff's Complaint liberally, and taking the fact that Dr. Bernstein responded to Plaintiff's letter into consideration, (Compl. 21), the Court considers Plaintiff's Complaint to allege that Dr. Bernstein was Thomas-Walsh's supervisor.

(Compl. 21.)  Dr. Bernstein also denied Plaintiff's request to have his primary care provider changed.  (*Id*.)  Plaintiff attached Dr. Bernstein's response to his Complaint.  Moreover, the Superintendent on September 8, 2014 noted that Thomas-Walsh and Dr. Bernstein together explained to Plaintiff that Vistaril was not appropriate for long-term use.  (Compl. 29.)

Courts in the Second Circuit are divided on whether a supervisor's "review and denial of a grievance constitutes personal involvement in the underlying alleged unconstitutional act." *Burton*, 664 F. Supp. 2d at 360 (citation omitted).  Judge Sand noted in *Burton* that some courts distinguish between the *degree* of response to an inmate's grievance—for example, between summarily denying a grievance and denying it in a detailed response that specifically addresses the plaintiff's allegations.  *See id*.  This Court finds that distinction persuasive.  "A supervisor's detailed, specific response to a plaintiff's complaint suggests that the supervisor has considered the plaintiff's allegations and evaluated possible responses. . . .  A pro forma response suggests nothing like that."  *Mateo v. Fischer*, 682 F. Supp. 2d 423, 430–31 (S.D.N.Y. 2010) (holding that the plaintiff's allegations that defendant received his letters, forwarded them to subordinates for investigation, and sent the plaintiff a response that he provided insufficient information to support his allegation, "prove only the scantest awareness of [the plaintiff's] claims" and failed to allege personal involvement (citation omitted)); *see also Keitt v. Schun*, No. 11-CV-438, 2014 WL 347053, at *7 (W.D.N.Y. Jan. 30, 2014) (declining to impose supervisory liability on a nurse administrator to whom the plaintiff had sent a letter complaining about intentional interference with his pain medication and who responded to the plaintiff that he was "scheduled to see a medical clinician to assess [his] medical concerns" because the nurse administrator's "generalized response to [the] plaintiff's complaint [was] not sufficient to establish personal involvement"); *Rosario v. Fischer*, No. 11-CV-4617, 2012 WL 4044901, at *5–6 (S.D.N.Y.

Aug. 28, 2012), *adopted by* 2012 WL 6681695 (S.D.N.Y. 2012) (holding that a pro forma letter sent to the plaintiff in response to his complaints did not allege sufficient facts to establish personal involvement).[12]

Drawing all reasonable inferences in favor of Plaintiff and reading his Complaint liberally, the Court concludes that taken together, Plaintiff's detailed letter to Dr. Bernstein, and Dr. Bernstein's response, plausibly suggest that Dr. Bernstein "considered . . . [P]laintiff's allegations and evaluated possible responses," *Mateo*, 682 F. Supp. 2d at 430–31, and that Dr. Bernstein's letter was not just a pro forma response, *see Burroughs v. Petron*, 138 F. Supp. 3d 182, 221–22 (N.D.N.Y. 2015) (imposing supervisory liability on a defendant the plaintiff sent a letter detailing the alleged retaliatory conduct where he attached a copy of the letter to his complaint, but declining to impose supervisory liability on the defendant that the plaintiff alleged responded to his complaint letter but failed to provide "any specific facts related to this alleged response"). Therefore, Plaintiff has plausibly alleged personal involvement by Dr. Bernstein and Defendants' Motion To Dismiss with respect to Plaintiff's First Amendment retaliation claim against Dr. Bernstein is denied.

---

[12] It appears that even before *Iqbal's* prohibition on the imposition of vicarious liability in § 1983 cases, courts in the Second Circuit declined to impose supervisory liability where a plaintiff made the conclusory allegation that he sent a letter to a prison supervisor alleging a deprivation of a right, but failed to allege sufficient further facts about the contents of the letter or the supervisor's response. *See, e.g., Applegate v. Annucci*, No. 02-CV-276, 2008 WL 2725087, *18 (N.D.N.Y. July 10, 2008) (holding that letter written to superintendent, without response, was insufficient to find personal involvement or awareness on behalf of superintendent); *Amaker v. Goord*, No. 98-CV-3634, 2002 WL 523371, *16 (S.D.N.Y. Mar.29, 2002) (holding that letters sent to commissioner, where letters were delegated to other prison officials, were insufficient to establish supervisory liability).

## III. Conclusion

For the foregoing reasons, the Court grants Defendants' Motion To Dismiss with respect to Plaintiff's Eighth Amendment medical deliberate indifference claim, and denies the Motion with respect to Plaintiff's First Amendment retaliation claim. In light of Plaintiff's pro se status, and because this is the first adjudication of Plaintiff's claims, his Eighth Amendment claim is dismissed without prejudice. If Plaintiff wishes to file an Amended Complaint alleging additional facts and otherwise addressing the deficiencies identified above, Plaintiff must do so within 30 days of the date of this Opinion and Order. Failure to do so will result in the dismissal of this claim with prejudice. Plaintiff is advised that the amended complaint will replace, not supplement, the earlier complaint. The amended complaint must contain all of the claims against all Defendants. The Court will not consider factual allegations contained in supplemental letters, declarations, or memoranda.

The Clerk of Court is respectfully direct to terminate the pending Motion, *(see* Dkt. No. 21), and mail a copy of this Opinion and Order to the Plaintiff.

SO ORDERED.

Dated:  March 27, 2019
        White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE